**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Michael Gordon, | ) | |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | **RE DEFENDANTS' MOTION FOR** |
| vs. | ) | **SUMMARY JUDGMENT** |
| | ) | |
| Leann K. Bertsch, Director, et al,, | ) | Case No. 1-15-cv-26 |
| | ) | |
| Defendants. | ) | |

Before the court is defendants' Motion for Summary Judgment. (Doc. No. 64). Plaintiff

Michael Gordon ("Gordon") opposes the motion. (Doc. No. 88). The undersigned recommends the

court grant the motion and dismiss the claims against the defendants, some with prejudice and others

without prejudice, for the reasons expressed below.

I.    **BACKGROUND**

A.    **Plaintiff Gordon**

Gordon is a federal inmate subject to the custody of the Federal Bureau of Prisons

("FBOP").[1] Gordon was placed at the North Dakota State Penitentiary ("NDSP") by the FBOP on

June 10, 2014, through a cooperative agreement with the North Dakota Department of Corrections

and Rehabilitation ("DOCR"), which operates the NDSP as well as North Dakota's other

correctional facilities. Less than ten months later, Gordon was removed from the NDSP by the

FBOP on March 28, 2015, at the NDSP's insistence.

---

[1] According to Gordon, he is "serving a federal sentence of 137.7 years of incarceration for the convictions of seven (7) violations of the Hobbs Act (18 U.S.C. § 1951) and seven (7) violations of carrying a firearm (18 U.S.C. § 924(c)) during the commission of a crime." (Docket No. 12).

### B.    The Defendants

Defendants at all relevant times were employed by the NDSP.  The following is a brief description of each defendant:

1.  Dr. John Hagan is a physician serving the inmate population at NDSP.  (Doc. No. 69).

2.  Jessica Wilkens is the Director of Nursing at NDSP, in which capacity she oversees the daily operations of the medical department.  (Doc. No. 68).

3.  Paul Belisle is a Shift Captain at NDSP.  (Doc. No. 70).

4.  Todd Flanagan is a Captain in Investigation at NDSP, where he handles reports of serious incidents that happen at NDSP.  (Doc. No. 71).

5.  Steve Foster is the Deputy Warden of Auxiliary Services at NDSP.  (Doc. No. 72).

6.  Steve Heit is a Case Manager at NDSP.  (Doc. No. 73).

7.  Justin Helgeson is also a Case Manager at NDSP.  (Doc. No. 74).

8.  Jody Kulman is the Assistant Food Service Director at NDSP.  (Doc. No. 75).

9.  Marc Schwehr[2] is a Captain at NDSP supervising the swing shift.  (Doc. No. 76).

10.  Cordell Stromme is the Chief of Security at NDSP.  (Doc. No. 77).

11.  Craig Theurer is a Security Equipment Officer at NDSP.  (Doc. No. 78).

12.  Corey Wald is a Case Manager at NDSP.  (Doc. No. 79).

### C.    This Action

Gordon initiated this action on March 9, 2015, shortly before he was removed from the NDSP. (Doc. No. 1).  Before his initial complaint could be screened pursuant to 28 U.S.C. § 1915A,

---

[2]  The court's prior orders and the docket sheet refer to Marc Schwer.  Unless quoting from the court's prior orders, the court will use the correct spelling of his name.

he filed an amended complaint. In his amended complaint, Gordon sought to sue more than twenty-five named and unnamed defendants on a variety of claims. (Doc. No. 12).

The undersigned prepared a report and recommendation for the screening of the amended complaint as required by § 1915A. (Doc. No. 28). Before the court could act on that report and recommendation, Gordon filed a second amended complaint in which he made some modifications to address certain problems identified in the initial report and recommendation. (Doc. No. 30). Gordon's second amended complaint was subjected to an additional review along with the issuance of a supplemental report and recommendation, which this court adopted. (Doc. Nos. 32-33). The result of this screening process was that Gordon was limited to proceeding on the following claims and only as to the following defendants:

1. Gordon will be allowed to proceed as to defendants Dr. John Hagan and Jessica Wilkens in their individual capacities only with respect to the following Eighth Amendment deliberate indifference claims:

   (a) failure to provide him a colonoscopy in light of his risk for colon cancer;

   (b) inadequate treatment for Hepatitis C;

   (c) inadequate treatment for allegedly very painful shoulder problems; and

   (d) inadequate treatment for allegedly very painful back problems.

2. Gordon will be permitted to proceed against defendants Todd Flanagan, Mark Schwer, Corky Stromme, Cory Wald, Steve Heit, Craig Thuerer, Justin Helgeson, Jamie Pederson, Jody Kulman, Paul Belisle, and Steve Forster, all in their individual capacities only, with respect to the claims of retaliation in paragraphs 65-78 of the Second Amended Complaint.

(Doc. No. 33, p.2).[3] The reasons for why Gordon was limited to proceeding against the defendants

---

[3] The court made clear to Gordon that he could seek to amend his complaint to add additional defendants if he was able to provide the court with more information as a result of the discovery in the action. However, Gordon did not avail himself of that opportunity. (Doc. Nos. 28 & 32). Also, service could not be made upon Jamie Pederson, so

only in their individual capacities were:  (1) the State's Eleventh Amendment immunity foreclosed any claim for damages against the defendants in their official capacities; and (2) the BOP's transfer of Gordon to another state's facility mooted any official capacity claims for non-monetary relief. (Doc. Nos. 28, 32, & 33).

## II.    THE FIRST AMENDMENT RETALIATION CLAIMS

Of the ten defendants who are being sued for retaliation, eight argue that Gordon did not properly exhaust their available prison remedies as to them.  And, while they request dismissal with prejudice, this is not permitted for the reasons stated later.  The other two defendants, who do not contend there was a lack of exhaustion of the claims against them, seek dismissal with prejudice on the merits.

Before turning to the retaliation claims, some additional background is in order.  Unless otherwise indicated, the following facts are either uncontested or have not been sufficiently controverted by Gordon.

### A.    Additional background

Gordon's short residency at NDSP was eventful.  After completing orientation upon arriving at the NDSP, Gordon was released into the general population in the East Unit.  A short time later, correctional officers located numerous items of contraband in his cell, including homemade alcohol, pills, a razor blade, screws, rope, etc.  Although Gordon's cellmate initially took responsibility for the contraband, he recanted after informing NDSP personnel he confessed because Gordon threatened to stab him.  (Doc. No. 72). Gordon was found guilty of possession of contraband and placed in administrative segregation ("AS").  (Doc. No. 72).   Following the incident, Gordon's

that individual is not party in this action.  (Doc. No. 51).

roommate was transferred out of the NDSP, as he "was terrified Gordon would kill him." (Doc. No. 72).

On September 27, 2014, approximately three weeks after being released from his first stay in AS, Gordon was involved in a physical altercation with another inmate following an exchange of sexual comments. (Doc. No. 72). A subsequent investigation, and a resulting incident report authored by defendant Flanagan, found that sufficient evidence substantiated a sexual harassment claim against Gordon. Following an October 7, 2014, disciplinary hearing presided over by defendant Heit, Gordon was found guilty. (Doc. No. 74). Heit issued Gordon a written warning regarding the sexual harassment.

At some point following this altercation, Gordon was again returned to AS, his third such stay in as many months. (Doc. No. 76). On October 2, 2014, defendant Schwehr wrote an AS referral requesting Gordon remain in AS because of his poor conduct. (Doc. No. 76). Pursuant to that referral, defendant Wald prepared a memorandum informing Gordon he would be placed in AS for his conduct. (Doc. No. 79). The AS Committee, consisting of defendants Wald, Stromme, and an individual not a party to this action, recommended Gordon remain in AS. (Doc. No. 77). The Warden ultimately declined to follow this recommendation and Gordon was released to the general population. (Doc. No. 76). Following his return, Gordon received a job in the NDSP kitchen as a dishwasher. (Doc. No. 75). After Gordon began his employment, multiple large batches of homemade alcohol were found in the kitchen, specifically in the dishwashing area. (Doc. No. 75). Defendant Kulman prepared an enhanced incident report regarding the matter. (Doc. No. 75). Defendant Belisle wrote a secure housing placement memo advising Gordon he was to be placed on detention status pending the outcome of an investigation into the incident. (Doc. No. 70). This

investigation implicated Gordon as the jailhouse brew master. (Doc. No. 67-6). Gordon was found guilty of brewing the alcohol, (Doc. No. 67-6), and once again returned to AS. (Doc. No. 72). No more alcohol was found once Gordon was removed from NDSP kitchen. (Doc. No. 72).

In addition to all of this, Gordon also found time to conduct some lawyering for fellow inmates. On January 26, 2015, NDSP staff found Gordon in possession of legal materials belonging to another inmate, which NDSP policy disallowed. (Doc. No. 67-4). Gordon had also logged onto the prison computer network using that inmate's credentials. (Doc. No. 67-4). According to prison officials, Gordon proceeded to lie to defendant Theurer when confronted. Following a hearing, defendant Helgeson, Gordon's case manager at the time, found Gordon guilty of being in possession of legal paperwork belonging to another inmate and lying to prison staff. (Doc. No. 67-4).

Deputy Warden Foster states it was because of these incidents that he warned Gordon he would be returned to the FBOP if his behavior did not improve. Foster states that later, when he concluded Gordon's behavior had not improved, he recommended to the Warden that Gordon be returned to the FBOP. According to the defendants, the NDSP Warden (who is not named in this action) made the final decision to end Gordon's eventful stay and it was because Gordon could not he could not acclimate to the general population. (Doc. No. 72). This was several weeks after the filing of this action but before the court's screening and court ordered service on the defendants.

As discussed later, Gordon claims that a number of the foregoing actions by the defendants were taken in retaliation on account of Gordon having filed previous grievances against them. Further, Gordon claims that his removal from the NDSP was in retaliation for the various grievances he had brought and his threats to file a civil action.

**B.    Unexhausted Retaliation Claims**

*1.    The PLRA Exhaustion Defense*

Congress enacted the Prison Litigation Reform Act of 1995 ("PLRA") to address the problems created by the large number of federal prisoner lawsuits. Among other reforms, the PLRA requires that prisoners exhaust prison grievance procedures before filing suit and an early screening of prisoner complaints by the court at the time of filing. 42 U.S.C. § 1997e(a); 28 U.S.C. § 1915A. See Jones v. Bock, 549 U.S. 199, 216–17 (2007) ("Jones"). The PLRA's exhaustion requirement reads as follows:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The Supreme Court has concluded that: (1) § 1997e(a) requires "proper exhaustion," *i.e.*, prisoners must complete the administrative process in accordance with the procedural rules set forth by the prison before suing, Woodford v. Ngo, 548 U.S. 81, 88 (2006) ("Ngo "); (2) prisoners must exhaust available administrative remedies even if they do not provide for the exact relief the prisoners want to sue for, Booth v. Churner, 532 U.S. 731, 121 (2001); and (3) failure to exhaust is an affirmative defense that must be pled and proved by the defendant, Jones, 549 U.S. at 216–17.

When the exhaustion defense has been properly raised, the Eighth Circuit has stated that the district court is "obligated" to determine whether or not the administrative remedies have been exhausted.  Chelette v. Harris, 229 F.3d 684, 688 (8th Cir. 2000).  And, if they have not, the court is to dismiss the unexhausted claims without prejudice.  See Porter v. Sturm, 781 F.3d 448, 452-53 (8th Cir. 2007) (dismissal for failure to exhaust as required by the PLRA must be without prejudice);

Barbee v. Corr. Medical Services, 394 Fed.Appx. 337, 338 (8th Cir. 2010) (unpublished per curiam) (concluding the district court erred in entering summary judgment of dismissal with prejudice on the merits for three defendants where it was clear there had been a failure to exhaust and remanding for dismissal without prejudice as to those defendants).  Further, as this court was instructed in Benjamin v. Ward County, 632 Fed.Appx. 301, 302 (8th Cir. 2016) vacating and remanding 93 F. Supp. 3d 1106 (D.N.D. 2015), the court is not permitted to bypass an exhaustion defense once it has been raised and resolve the case on the merits, even when that is easier.[4]

Finally, this statutory framework necessitates examination of the particular policies in place at the particular institution to determine whether an inmate exhausted the administrative process prior to commencing litigation since it is these policies that control.  See, e.g., Jones, 549 U.S. at 218.

### 2.    The NDSP grievance procedures

The following are the NDSP's grievance procedures that were in effect in this case:

### GRIEVANCE PROCEDURE

1. A grievance is a written, individual complaint filed by an inmate concerning the matters that may personally affect the inmate, including:
  a. Policies, rules, and procedures enforced within the institution;
  b. Reprisals or retaliatory actions against the inmate for filing a grievance under the inmate grievance procedure, or for participation in an inmate grievance proceeding;
  c. A lack of a policy, regulation, rule or procedure that affects the living conditions

---

[4]  The defendant may, however, waive any failure to exhaust either by not raising the defense or later explicitly waiving it. See, e.g., Benjamin v. Ward County, No. 4;12-cv-028, 2016 WL 2758266, at **2-3 (May 12, 2016) (giving effect to defendant's post-remand waiver and dismissing the case on the merits), aff'd 676 Fed.Appx. 627, 628 (unpublished per curiam) (affirming the dismissal on the merits without addressing the propriety of the waiver).  In some cases, that may be more expedient rather than expending the time and expense to litigate difficult exhaustion issues, including possibly having to be subjected to discovery and an evidentiary hearing.  Also, there is the risk of a possible return to this court if, on appeal, it is determined that the court wrongly concluded that one or more of the claims had not been exhausted or there are disputed facts with respect to whether prison officials acted in manner that prevented the prisoner from being able to fully exhaust the claims.  Finally, as noted above, the dismissal for failure to exhaust is without prejudice.

of an inmate within the institution;

d. Actions of inmates or staff that directly affect the inmate and are not covered by part 2 (c) below.

e. Concerns with personal needs and services (i.e., for example, religious, recreational, medical, treatment, or education matters.).

2. Issues that are not grievable under ND DOCR grievance procedures include:

a. Any process with an established, formalized appeal or review process, including:

(1) Disciplinary proceedings

(2) Classification proceedings

(3) Administrative Segregation placement

(4) Medical Payment Committee or co-pay decisions

b. Actions of persons or entities outside the jurisdiction of the institution, including:

(1) The enactment of State or Federal laws, treaties, or administrative

(2) Court decisions

(3) Parole Board decisions

(4) Pardon Advisory Board recommendations and Governor's decisions.

3. Before you may file a Step 1 Grievance, you are required to attempt to resolve your complaint informally. Prior to informal resolution, you must clearly and legibly document your complaint, one issue only, in the space provided on the Informal Resolution/Step 1 Inmate Grievance form. You may obtain assistance from other inmates or staff to complete the form, but you must sign the form on the signature line and record the date. The informal resolution/Step 1 Inmate Grievance request must be submitted within 15 days of the alleged incident. Informal resolution means discussing your complaint with the staff member who you have the complaint with, discussing it with your case worker or case manager, or with the department head, and coming to a resolution. This step must be documented on the Informal Resolution/Step 1 Inmate Grievance form and signed by you and the staff attempting the informal resolution.

4. If you are not satisfied with the results of your attempt at informal resolution, you may file a Step 1 grievance with your case manager by checking the box "disagree" with the signature of the attempted informal resolution. You must sign the for by the informal resolution section and check the box appropriately if you wish to file the step one grievance. Your case manager or designee will discuss the grievance with you, conduct an investigation if necessary and make a recommendation as to the formal resolution of the grievance. The staff assigned to the step one grievance will discuss their recommended formal resolution with you. If you agree with their recommendation you are required to sign the signature line under the step one grievance area, date and check the box that you agree. If you disagree with the step one formal resolution recommendation you can start the step two grievance by checking the box "disagree", signing and document the date." You must sign, date and check the "disagree" box in order to proceed to a step two comment of the step one grievance. Only one issue may be addressed per grievance form and you must write it legibly in the space provided, you are not allowed to attach additional pages. If you exceed the space provided your grievance will be returned unanswered and you will have to resubmit your grievance following the correct format.

5. Step 2 Grievance: You may, within 5 days of the receipt of the Step 1 response, elect to file a Step 2 grievance with your case manager. No additional facts, variations of the original issue stated in the original grievance or new issues may be raised. The case manager will forward the completed Step 2 form to the Warden's office. The Warden will determine whether additional investigation is required. The Warden may conduct the investigation or appoint a staff member to conduct it and report findings. You will receive the Warden's decision within 10 working days of receipt by the Warden's office. Some grievances may take additional time to investigate and respond.

6. Grievance Appeal: If you are dissatisfied with the Warden's response, you may file an appeal to the Director.

7. If your grievance is of a sensitive nature and you fear possible adverse effects within the institution, you may file your grievance directly with the Director of Corrections and Rehabilitation through the mail. You must clearly explain your issue and why you fear adverse effects if you do not follow the grievance procedure. NOTE: If the DOCR Director determines the grievance is not of a sensitive nature, the grievance will be returned to you to file through the usual grievance procedures.

8. If the Warden or the DOCR Director determines you are abusing the grievance procedure through the submission of grievances that are frivolous, harassing, repetitive, or include false or defamatory statements about DOCR employees, officers, and officials, the Warden or the DOCR Director; may place restrictions on your ability to file grievances or decline to respond to the grievance.

(Doc. No. 67-9).  This policy provides first for informal resolution of the grievance followed by a

Step 1 grievance, a Step 2 grievance, and then an appeal to the Director of DOCR.  To fully exhaust

these administrative remedies, Gordon was required to complete each of the steps as to each of his

claims.  An exception is if Gordon was  prevented by prison officials from doing so, either directly

or by their inaction, including failure to respond when the procedure contemplates a response before

the next step can be taken. See, e.g., Porter v. Sturm, 781 F.3d at 452 (discussing Eighth Circuit

precedent).

> 3.    *Claims against Flanagan, Stromme, Wald, Theurer, Kulman, & Belisle*

Gordon alleges in his Second Amended Complain that the following defendants retaliated

against him by engaging in the following described conduct on account of Gordon having previously

filed grievances against them:

| Defendant | Alleged retaliatory act |
|---|---|
| Flanagan | False misbehavior report on 9/27/14 |
| Stromme | False AS referral on 10/3/14 |
| Wald | False AS referral on 10/3/14 |
| Theurer | False misbehavior report on 2/27/15 |
| Kulman | False misbehavior report on 2/27/15 |
| Belisle | False misbehavior report on 2/17/15 |

These defendants argue that Gordon failed to exhaust the NDSP's grievance process with respect to the above claimed acts of retaliation, contending Gordon never filed even a Step 1 grievance for any of them. In response, Gordon does not contend that his claims of retaliation in each instance were not grievable. Rather, he argues that he delivered one or more Step 1 grievances to his case manager covering each of the claimed acts of retaliation but never received responses. If that was true and he did not receive responses, then, arguably, Gordon was not required to proceed further and his claim(s) would be deemed fully exhausted since, under the NDSP's grievance procedure, it appears that a response is a condition precedent to moving to the next step.

Defendants have submitted an affidavit from a DOCR administrative assistant stating that she has reviewed all of the NDSP's records for any grievances (Step 1 or otherwise) that may have been filed by Gordon with respect to the listed defendants alleging the above acts of retaliation and found none. (Doc. No. 67). In addition, defendants have filed with the court copies of the records kept at the NDSP related to grievances filed by Gordon. This "administrative record" is just over 200 pages in length and includes copies of numerous grievances filed by Gordon (many of which

-11-

are not at issue in this case), staff responses, NDSP Warden decisions, appeals to the DOCR, and decisions by the DOCR Director.  (Doc. No. 67-14).  Absent is any record of Gordon having filed a Step 1 grievance for any of the above listed defendants as to the alleged acts of retaliation.  Finally, each of the above named defendants have filed affidavits stating that they do not recall any grievance being filed by Gordon against them related to the above listed claims of retaliation.  (Doc. Nos. 70, 71, 75, 77-79).

### 4.      *Claims against Schwehr and Helgeson*

Gordon also alleges that defendant Schwehr retaliated against him on two occasions for previous grievances that he had brought against Schwehr.  Schwehr argues in response that, while Gordon commenced the grievance process with respect to these two retaliation claims, he never completed either one and, for that reason, he failed to exhaust his administrative remedies.

Gordon's first claim of retaliation is that Schwehr filed a false AS referral on October 3, 2014. The administrative record filed by the defendants reflects that Gordon did file a Step 1 grievance on October 18, 2014 with respect to this claim, but it was dismissed on account of Gordon's failing to have first attempted to resolve the grievance informally per the grievance policy. (Doc. Nos. 67-14, pp. 1-2).  Then, instead of attempting to cure the purported deficiency, Gordon filed a Step 2 grievance on November 21, 2014, which was again denied on account of his failure to follow proper procedures initially.   (Id. at p.  36). While Gordon claims he then tendered to his case manager an appeal to the DOCR Director, which is the next step in the administrative process after the Warden (or someone acting on his behalf) denies the Step 2 grievance, the administrative record filed by the defendants reflects no such appeal.  Further, Gordon does not claim, nor does the administrative record reflect, that he attempted to cure the claimed deficiencies in his grievances as

set forth in the responses to his Step 1 and the Step 2 grievances.   (Doc. No. 67-14).

Gordon also alleges that Schwehr retaliated against him by submitting a false misbehavior report on January 28, 2015.  With respect to this claim, Gordon filed a Step 1 grievance on January 30, 2015, to which the response was that he could not grieve an "incident" report and that the report had yet to be heard.  (Doc. No. 67-14, p. 77).  It appears this response was incorrect.  While under the NDSP's grievance policy a grievance cannot be taken challenging the outcome of a disciplinary hearing (since that has its own procedures for review), a grievance can be lodged for any alleged act of retaliation purportedly taken on account of the prisoner having previously filed a grievance against the person engaging in the alleged retaliatory conduct.  If the evidence here was that Gordon had stopped at that point in reliance upon what he was told, then Schwehr, arguably, would have no defense based on a failure to exhaust this claim.  See, e.g., Brown v. Croak, 312 F.3d 109, 110-13 (3d Cir. 2010).  But, in this case, Gordon claims he did provide his case manager with a Step 2 grievance, which reflects he was not misled.  But again, the administrative record filed here contains no Step 2 grievance and Gordon has not provided any other evidence (such as a copy of the Step 2 grievance) that supports his claim that he provided one to his case manager.

Generally speaking, if there are fact issues that need to be decided in order to resolve a failure-to-exhaust defense, the court must conduct further proceedings, including possibly holding an evidentiary hearing.  See, e.g., Small v. Camden County, 728 F.3d 265, 269–71 (3d Cir. 2013); Pavey v. Conley, 544 F.3d 739, 740–42 (7th Cir. 2008); Chelette v. Harris, 229 F.3d 684, 688 (concluding that the procedures outlined in Osborn v. United States, 918 F.2d 724, 729–30 (8th Cir. 1990) for resolving disputed facts over subject matter jurisdiction apply to resolution of failure-to-exhaust issues).  In this case, however, there is no need for further proceedings.  As noted

above, Gordon claims he gave his case manager the filings required for the completion of the administrative exhaustion of his retaliation claims, but the only evidence of this are his own self-serving statements.    In this case, this is not enough given: (1) the evidence marshaled by the defendants that the claimed filings were never made; and (2) Gordon's failure to proffer any contrary evidence.

In conclusion, defendants Flanagan, Stromme, Wald, Thuerer, Kulman, Belisle, Schwehr, and Helgeson are all entitled to dismissal of the claims brought against them based upon Gordon's failure to exhaust his administrative remedies as required by 42 U.S.C. § 1997e(a).  The dismissal must, however, be without prejudice under Eighth Circuit precedent previously cited.

### C.    Exhausted Retaliation Claims

#### 1. Heit

Gordon alleges Heit retaliated against him by finding him guilty of sexually harassing another inmate after Gordon filed a grievance against Heit.  As discussed above, Gordon was accused of sexually harassing another NDSP inmate while in the shower.  Following an October 7, 2014, hearing, Heit found Gordon guilty.  Heit argues summary judgment is appropriate because Gordon did not file any grievances against him until after the October 7, 2014, hearing, meaning he could not retaliate against something that had yet to occur.  Gordon takes exception with this statement, arguing he filed a grievance against Heit prior to his disciplinary hearing.

Although this claim contains competing allegations, only Heit has presented any type of substantiation for his claim.  In his affidavit, Heit attests to the following:

> Gordon filed many grievances against me.  However, those grievances were all filed after the October 7, 2014 Disciplinary Hearing Level II and III determination.  It is my information that Gordon filed or appealed grievances against me on the following dates: October 23, 2014; November 20, 2014; December 8, 2014; December 19, 2014; January 5,

2015; January 6, 2015; January 13, 2015; January 15, 2015; and January 30, 2015. These
grievances generally alleged that I was retaliating against Gordon in some manner.

(Doc. No. 74). These dates correspond with the hundreds of pages of documentation related to

Gordon's grievances submitted in conjunction with the current motion. (Doc. Nos. 67-14 pp. 30,

33, 35, 38-53). Nothing within the dozens of grievances filed therein indicates Gordon filed a

grievance against Heit prior to his disciplinary hearing. Rather, Gordon's flurry of grievances

against Heit began only after the October 7, 2014, hearing. Although Gordon argues Heit "retaliated

against Gordon because Gordon filed a Step 1 grievance against [Heit] prior to the October 7, 2014

hearing . . ." (Doc. No. 88), he has not provided anything other than his self-serving affidavit to

support that allegation. On this record, there is no genuine dispute about whether Gordon filed a

grievance against Heit prior to the October 7, 2014, hearing. Because it is axiomatic someone cannot

retaliate against something that has yet to occur, Heit could not have retaliated against Gordon by

finding him guilty of sexually harassing another inmate. Heit is entitled to summary judgment as

to Gordon's retaliation claim.

### 2. Foster

In his final retaliation claim, Gordon alleges Deputy Warden Foster retaliated against him

for using the NDSP grievance policy (including filing a grievance against Foster personally) by

having him sent back to FBOP custody, thus terminating his residency at the NDSP.

With respect to this claim, the record reflects that, on March 2, 2015, Gordon filed a

grievance against Foster in which he claimed Foster had threatened to send him back to the federal

system if he kept filing grievances and or a civil lawsuit. Gordon claims that Foster stated

specifically: "You file on everything! Do you want to go back, cause I will send you back!" (Doc.

No. 67-7, p. 1). When not satisfied with the institutional responses, Gordon filed a Step 1 grievance

on March 6, 2015, and then a Step 2 grievance to the Warden on March 12, 2015.  (Id. at 1-2).  The

gist of NDSP staff responses, including that of the Warden, was to advise Gordon that the statements

that Foster actually made were not in retaliation of his having filed grievances, but because of

Gordon's own behaviors and choices.  (Id. at 1-2).[5]

In terms of this action, in addition to denying the particulars of Gordon's allegations, Foster

argues Gordon's retaliatory transfer claim is subject to dismissal because he cannot demonstrate that

his use of the grievance system was the "but for" cause of his transfer from the NDSP.

The Eighth Circuit has outlined the law that applies to claims for retaliatory transfer as

follows:

> In general, a prisoner enjoys no constitutionally protected right against transfer to another prison. Goff v. Burton, 91 F.3d 1188, 1191 (8th Cir.1996). And "[j]ust as an inmate has no justifiable expectation that he will be incarcerated in any particular prison within a State, he has no justifiable expectation that he will be incarcerated in any particular State." Olim v. Wakinekona, 461 U.S. 238, 245, 103 S.Ct. 1741, 1745, 75 L.Ed.2d 813 (1983). Prison authorities have a great deal of discretion in running their institutions, and such discretion normally outweighs any interest that any individual prisoner may have in remaining housed in a particular prison. Sanders v. St. Louis County, 724 F.2d 665, 668 (8th Cir.1983). Nevertheless, a prisoner cannot be transferred in retaliation for his exercise of constitutionally protected rights, Goff, 91 F.3d at 1191, either between prisons in a single state, or between state and federal prison systems under the Interstate Corrections Compact. Sisneros v. Nix, 95 F.3d 749, 751 (8th Cir.1996).
>
> To successfully argue retaliatory transfer in violation of his constitutional rights pursuant to § 1983, Rouse "must prove that a desire to retaliate was the actual motivating factor behind the transfer." Goff, 91 F.3d at 1191. *In other words, Rouse must prove that but for his protected First Amendment activity, he would not have been transferred.* Id. On this appeal, however, we need only decide whether, viewing the evidence in the light most favorable to Rouse, a reasonable jury could find that the "but for" test is satisfied on the facts of this case.

Rouse v. Benson, 193 F.3d 936, 940 (8th Cir. 1999) (italics added).  As Foster correctly argues,

Gordon must prove that, but for his First Amendment activity, he would not have been transferred.

---

[5]  Gordon did file an appeal to the Director of the DOCR on March 24, 2015, but it appears that this was not acted because Gordon had already been transferred out of the NDSP.  (Doc. No. 67-7, p. 3).

Id.

As outlined in the preceding pages, Gordon's residency at the NDSP was, putting it mildly, turbulent. Within weeks of being admitted to the NDSP, Gordon was placed in AS after jailers found contraband in his cell, including razors, for which Gordon threatened his roommate into claiming responsibility. Shortly after being returned to the general population, Gordon was involved in a physical confrontation with another inmate and convicted of sexual harassment. While employed at the NDSP kitchen, Gordon apparently began a jailhouse brewery, and, when discovered, he coerced other inmates into claiming responsibility. Gordon was also found to be in possession of legal work belonging to another inmate and, when confronted, lied to prison officials. Taken in its totality, Gordon's conduct at the NDSP exhibited a total disregard for its rules along with an inability to peacefully coexist with the general prison population. In view of these things, Foster had ample justification for recommending that FBOP be required to remove Gordon from the NDSP.

On record before the court, no reasonable jury could conclude that Gordon's filing of grievances, including one against Foster personally, was the but for cause of his transfer from the NDSP, notwithstanding its timing and even assuming Foster's recommendation amounted to the final determination.[6] Particularly relevant in this regard is a memorandum that Foster sent to Karen Jusilla, the FBOP case manager, on March 2, 2015. After reciting the history of all the disciplinary problems that the Gordon had during his short stay, including one the latest incidents of contraband alcohol and Gordon's threats to inmates who informed on him, Foster concluded by stating:

---

[6] Alternatively, Foster argues he cannot be found liable on Gordon's retaliatory transfer claim because he did not possess the final decision-making power over whether Gordon would remain at NDSP or whether he would return to BOP custody. Because no reasonably jury could conclude that Gordon's use of the prison grievance system was the "but for" cause of his transfer from NDSP, the court need not reach this argument.

> Gordon was placed in administration segregation for the safety of other inmates, because he would likely know who provided information on him. *The DOCR has a small system and cannot continue to keep separating inmates from Gordon.*

(Doc. No. 67-5, p.2) (italics added).

For these reasons, Foster is entitled to summary judgment in his favor with respect to Gordon's retaliatory transfer claim.

## III.  THE EIGHTH AMENDMENT "DELIBERATE INDIFFERENCE" CLAIMS

### A.  Introduction

As noted earlier, the court permitted Gordon to proceed against Dr. Hagan and Director Wilkens in their individual capacities with respect to the following four claims:

1.    failure to provide him a colonoscopy in light of his purported risk for colon cancer;

2.    inadequate treatment for hepatitis C;

3.    inadequate treatment for allegedly very painful low back problems; and

4.    inadequate treatment for allegedly very painful shoulder problems.

`    Also, as noted earlier, Dr. Hagan is the NDSP's in-house physician.  Wilkens is an RN and the NDSP's  Director of Nursing.  Wilkens' position entails more than what might be gleaned from its title, however.  She is actually the administrative head of the NDSP's medical department.  In her affidavit, Director Wilkens describes her duties as follows:

> 3.    As Director of Nursing, my duties include: coordinating daily operations of the medical department, overseeing operation of the NDSP medical department, and oversee medical staff assessing the health care needs of the inmate population.

(Doc. No. 68).

### B.  Governing Law

The Eighth Amendment's guarantee against cruel and unusual punishment is violated when

prison officials exhibit deliberate indifference to an inmate's serious medical needs.  Estelle v. Gamble, 429 U.S. 97, 104 (1976); Popoalii v. Correctional Med. Services, 512 F.3d 488, 499 (8th Cir. 2008).  To prevail on a claim of constitutionally inadequate medical care, an inmate must prove both an objective and a subjective component:  (1) that the inmate suffered from an objectively serious medical need and (2) that prison officials actually knew of the need and deliberately disregarded it.  See, e.g., Dadd v. Anoka Cty., 827 F.3d 749, 752 (8th Cir. 2016); Jackson v. Buckman, 756 F.3d 1060, 1065 (8th Cir. 2014).

To be objectively serious, a medical need "must have been 'diagnosed by a physician as requiring treatment' or must be 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'"  Id. (quoting Scott v. Benson, 742 F.3d 335, 339-40 (8th Cir. 2014)).  Deliberate indifference is "more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation."  Popoalii, 512 F.3d at 499 (quoting Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995)).  Deliberate indifference requires a showing of a mental state akin to criminal recklessness, that is "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer v. Brennan, 511 U.S. 825, 837 (1994); see Jackson, 756 F.3d at 1065.

The net result of these requirements is that medical malpractice alone does not amount to deliberate indifference.  Jackson, 756 F.3d at 1065-66.  Rather, "[a]n inmate must demonstrate that a prison doctor's actions were 'so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care.'"  Id. at 1066 (quoting Dulany v. Carnahan, 132 F.3d 1234, 1240-41 (8th Cir. 1997)).  When the allegation is one of lack of treatment, "'the failure to treat a medical

condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge.'" Burke v. N.D. Dep't of Corrections and Rehabilitation, 620 F. Supp. 2d 1035, 1065 (D.N.D. 2009) (quoting Vaughn v. Gray, 557 F.3d 904, 908 (8th Cir. 2009)). Finally, when an "inmate alleges that a delay in medical treatment rises to the level of an Eighth Amendment violation, the objective seriousness of the deprivation should also be measured by reference to the *effect* of delay in treatment." Laughlin v. Schriro, 430 F.3d 927, 929 (8th Cir. 2005) (italics in original; quotation and internal quotation marks omitted). "To establish this effect, the inmate must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." Id. (quotation and internal quotation marks omitted).

Whether medical staff deliberately disregarded the needs of an inmate is a factually-intensive inquiry. Meuir v. Greene Cty. Jail Employees, 487 F.3d 1115, 1118-19 (8th Cir. 2007).

### C.    Colonoscopy

#### 1.    Additional background

Gordon first expressed concern about his colon during a November 10, 2014, meeting with a nurse practitioner. (Doc. No. 68-12). According to the notes of that meeting, Gordon reported "his father had colon CA and wishes to have colonoscopy, last was in 2009 with no abnormalities or polyps, states he was advised to have one every 5 years." (Id.). The notes further indicate that the nurse would make a referral for a doctor consult.

Without waiting, Gordon filed a grievance on November 10, 2014, stating he has a family history of colon cancer and that he requested a colonoscopy. The "informal response" made by Director Wilkens on December 10, 2014 was that Gordon had been referred for a medical consult

and it was the primary care provider's decision whether a colonoscopy was medically required or not.  (Doc. No. 67-14, p. 57).

On that same date, Gordon saw physician's assistant Houdek, during which he complained of constipation and again relayed his desire to have a colonoscopy.  PA Houdek decided to obtain guaiac stool samples from Gordon for testing for colon cancer and also noted "I have asked to look into federal approval for a colonoscopy on him."  (Doc. No. 68-16).  Gordon's guaiac stool samples later came back as having tested negative.  (Doc. No. 68-17).

The next day Gordon proceeded with Step 2 of his grievance, to which NDSP administrative staff member Jean Sullivan responded on December 19, 2014, as follows:

> I recommend this grievance be dismissed based on the fact that Michael Gordon has not been denied a colonoscopy by staff from NDSP.  On 12-1--14, he was seen by primary care provider, PD Houdek.  PA Houdek ordered a colonoscopy be done on Michael Gordon.  Michael Gordon is a Federal inmate and the Bureau of Prisons must approve this order prior to the colonoscopy.

(Doc. No. 67-14, p. 56).  The warden approved this disposition on December 23, 2014.  (Id. at p. 56).  Gordon then appealed further to the Director of the DOCR and, on February 5, 2015, the Acting DOCR Director upheld the disposition, stating that the colonoscopy had been approved by the NDSP medical staff but that further approval was required by the FBOP.  (Id. at pp. 54-55).

 Gordon did not receive a colonoscopy prior to being transferred out of the NDSP on March 27, 2015.  The reasons for that are unclear.  It appears the person responsible for seeking approval from the FBOP and scheduling the procedure was Director Wilkens.   This is based on her job title as well other references in the medical records to her being the person who would contact the FBOP with respect to other procedures.  (Doc. Nos. 68-7).

2.    *Dr. Hagan*

Gordon claims Dr. Hagan was deliberately indifferent when he did not order a colonoscopy. Dr. Hagan's response in an affidavit filed in this action, however, is that: "Gordon never requested a colonoscopy screening be done during any interactions I had with him.  I never treated Gordon for any complaints regarding a colonoscopy.  I was not deliberately indifferent to Gordon's medical needs relating to his colon as I was not aware of any request for a colonoscopy."  (Doc. No. 69 ¶ 13). To support these attestations, Hagan points to the notes from the various meetings he had with Gordon, which indicate Gordon did not complain about any colon concerns to Hagan.  (Doc. Nos. 68-13, 68-18, 68-22, 68-24).  Hagan's affidavit then goes on to state:

> Although I did not treat Gordon for any issue related to his colon or a colonoscopy, I reviewed the medical records and note that he was treated by Physician Assistant Deb Houdek (Houdek) on December 10, 2014.  At this appointment Houdek ordered appropriate screening labs including stool studies to detect blood loss.  These tests, known as fecal occult blood tests, are the US Preventative Services Task Force standard of care for screening for colon cancer.  The results of those tests were received on December 14, 2014, and showed no blood in Gordon's stool or evidence of increased risks of polyps or colon cancer.

(Doc. No. 69 ¶14).[7]  In short, Dr. Hagan's defense is that he had nothing to do with this matter, but, in any event, Gordon received adequate care from PA Houdek.

In response to Dr. Hagan's statements that he had no personal involvement, Gordon offers nothing more than conclusory allegations to the contrary.  This is insufficient, particularly at the summary judgment stage.   For this reason alone, Gordon's Eighth Amendment deliberate indifference "colonoscopy claim" against Dr. Hagan in his personal capacity fails.

Further, any obligation of the NDSP and its staff to provide Gordon a colonoscopy (assuming

---

[7] It is unclear from the affidavit whether the review of the medical records Dr. Hagan talks about was recent or whether it was contemporaneous to the time that Gordon saw PA Houdek about a colonoscopy.

for the moment there was one) ended when Gordon was transferred out of the DOCR's custody and control. Hence, Gordon's claim is essentially one of whether any delay in affording what he claims was essential treatment rose to the level of an Eighth Amendment violation. As noted earlier, the Eighth Circuit has held that a prisoner must demonstrate that he or she has suffered some detrimental effect from the delay, including offering verifying medical evidence of the detrimental effect, in order to make out an Eighth Amendment claim based on delay. Laughlin v. Schriro, 430 F.3d at 929. In this case, Gordon has not offered any evidence of having suffered a detrimental effect from not having been given a colonoscopy during his stay at the NDSP; hence, Gordon's colonoscopy claim fails for this reason as well.[8]

### 3.    Director Wilkens

Director Wilkens states in affidavit with respect to the Gordon's colonoscopy and other deliberate indifference medical claims, the following:

> 11.    I did not directly provide any medical care or treatment to Gordon. I did review and respond to kites or grievances regarding medical care sent by Gordon.

---

[8] As noted above, Gordon claims he was advised by FBOP prison doctors to have a colonoscopy every five years given his family history of colon cancer and PA Houdek recommended seeking approval from the FBOP for one in addition to the fecal occult blood tests. Dr. Hagan states in an unchallenged affidavit that the fecal blood tests ordered by PA Houdek "are the US Preventative Services Task Force standard of care for screening for colon cancer" and that the test of Gordon's stools were negative. From that defendants argue that a colonoscopy was not essential care and the fact Gordon preferred another course of treatment does not give rise to an Eighth Amendment violation. In support, defendants cite Jackson v. Jones, No. 3:16-cv-551, 2017 WL 1362131, at *6 (N.D. Fla. Mar. 22, 2017), report and recommendation adopted, 2017 WL 1380451 (N.D. Fla. Apr. 10, 2017) (rejecting a claim of deliberate indifference where prison medical staff chose stool sample cards (i.e., fecal occult blood tests) as a diagnostic tool instead of a colonoscopy, stating "[a] medical decision not to pursue a particular course of diagnosis or treatment is a classic example of a matter for medical judgment, an exercise of which does not represent cruel and unusual punishment under the Eighth Amendment"). A close examination of Jackson indicates, however, that these statements were made in the context of the particular facts of that case and were not a broad statement that fecal occult blood tests are constitutionally sufficient under all circumstances. Since there are other grounds for the court denying Gordon's colonoscopy claim, it may be prudent to avoid any holding in this case that could be construed as putting a judicial imprimatur upon fecal blood test screening for colon cancer in all circumstances. That being said, Gordon (who has the burden of proof) offered no medical evidence demonstrating that a colonoscopy amounted to essential care in this instance such that the failure to provide it amounted to a constitutional violation.

12.    I did not deny, refuse, delay, interfere, or fail to provide adequate medical treatment to Gordon. I did not falsify medical records or lie to Gordon about treatment, treatment referrals, or diagnosis of any conditions he may have had. I did not and do not pursue a standard of medical care that is known to be ineffective.

13.    Any request for a colonoscopy is decided by the primary care provider, as I was not Gordon's primary care provider, I did not decide whether a colonoscopy screening was necessary, I did not deny him the screening. I was not deliberately indifferent to Gordon's medical needs as I was not the one deciding his treatment.

14.    I was not deliberately indifferent to Gordon's medical needs relating to his shoulder pain, back pain, or Hepatitis C treatment. I was not responsible for providing treatment to Gordon. I responded to certain grievances Gordon filed and I placed him on the doctor's schedule when he requested to be seen.

(Doc. No. 68, p.3). Further, in support of her arguments for no liability, she cites Meloy v. Bachmeier, 302 F.3d 845, 849 (8th Cir. 2002) wherein the Eighth Circuit stated with respect to her predecessor that the "law does not clearly require an administrator with less medical training to second-guess or disregard a treating physician's treatment decision." Id. at 849.

Gordon's argument, however, is that Director Wilkens was responsible for seeing to it that he received the colonoscopy recommended by PA Houdek and that the Warden agreed would be provided if FBOP approval was obtained. And here, construing the facts most favorably for Gordon (which is the court's obligation at this point), there may be a fact issue with respect to what Wilkens did or failed to do in terms of obtaining FBOP approval for the colonoscopy and, if approval was obtained, scheduling the procedure. That being said, Gordon's colonoscopy claim fails as to Wilkens due to his failure to offer evidence of his having suffered any detrimental effect resulting from any delay in his obtaining a colonoscopy caused by his inability to obtain one while at the NDSP.

### D.    Hepatitis C

#### 1.    Additional background

On June 18, 2014, which was soon after Gordon's arrival at the NDSP, he was placed on sick

call for reactive hepatitis C. (Doc. No. 68-4). Then, during a July 7, 2014, meeting with one of the staff nurses, Gordon "expressed interest in treatment" (Doc. No. 68-6).

There is no indication of anything further happening until Gordon met with a nurse on November 10, 2014. The note from that meeting states that Gordon wished to begin treatment for hepatitis C and that he was referred for a medical consult.[9] (Doc. No. 68-12).

On the same date, however, Gordon filed a grievance complaining that he had some time ago requested treatment for hepatitis C but had yet to be treated. Defendant Wilkens made the following "informal response" on December 10, 2014:

> Inmate arrived to NDSP June of 2014. Regular policy & procedure to be followed re: hepatitis C treatment. If treatment is indicated/ordered by Primary Care - approval will be sought from Federal System & must be obtained prior to starting treatment regimen.

(Doc. No. 67-14, p. 61). Director Wilkens' statement that regular policy and procedure for treatment of hepatitis C would be followed appears to have meant that there would no treatment, even blood draw monitoring, until Gordon had been at the NDSP for six months. This is because the DOCR Acting Director later advised Gordon in a letter dated February 5, 2015:

> The grievance officer explained that based on medical policy, an inmate must be incarcerated at a DOCR facility for a minimum of six months before treatment for Hepatitis C can be started and since you only arrived in June 2014, your blood work will be started in January 2015. After the results are received, the recommendations will be sent to the Bureau of Prisons for approval.

(Doc. No. 67-14, p. 58).

Apparently, the necessary monitoring blood work began sometime in early 2015. This is because, when Gordon met with Dr. Hagan on March 25, 2015, Dr. Hagan noted the following in

---

[9] Gordon also saw Dr. Hagan on November 10, 2014, but it appear this was prior to his seeing the nurse about his hepatitis C and a foot fungus. Also, Dr. Hagan's call notes for that date reflect only an examination with respect to Gordon's complaints of right shoulder and low back pain with no mention of hepatitis C. (Doc. Nos. 68-12 & 68-13).

his notes with respect to Gordon's request for a liver biopsy and drug treatment for hepatitis C:

> Hepatitis C treatment: I shared with the patient that his current lab tests make him a low priority for treatment according to the FBOP guidelines. The patient disagrees with my assessment and states that a biopsy is required. I have informed the patient that this is not part of the new guidelines. The patient indicated that he will grievance this response.

(Doc. No. 68-24).

Three days later, Gordon's stay at the NDSP ended.

### 2. Dr. Hagan

As noted above, Dr. Hagan's only involvement with respect to Gordon's demand for hepatitis C was during the March 24, 2015 meeting.[10] And, while it appears Dr. Hagan would not order a liver biopsy and noted Gordon would be low in priority for treatment under FBOP guidelines based on his lab results, Gordon's stay at the NDSP ended three days later. Consequently, even if Dr. Hagan had agreed to a biopsy and recommended drug treatment, it would not have made a difference since there is no indication that anything would have been done during those three days. Further, as with the "colonoscopy claim," Gordon has failed to provide any medical evidence suggesting he suffered any adverse consequences as result of any delay in treatment due to his inability to get drug treatment for his hepatitis C during his stay at the NDSP. In short, Gordon's deliberate indifference hepatitis C claim against Dr. Hagan in his individual capacity fails.[11]

---

[10]  There is no evidence that Dr. Hagan was responsible for the DOCR's six-month wait policy.

[11]  It is also argued that that Gordon's disagreement with Dr. Hagan's medical decision not to use a liver biopsy as a diagnostic tool for hepatitis C treatment and rely upon blood monitoring, which Dr. Hagan stated was consistent with the then applicable FBOP guidelines, is not actionable because it does not rise to the level of deliberate indifference. Cited in support is Black v. Alabama Dep't of Corr., 578 F. App'x 794, 796 (11th Cir. 2014) (unpublished per curiam) (rejecting a claim of deliberate indifference where medical staff monitored prisoner's Hepatitis C through lab results and denied his requests for admission to a Hepatitis C treatment program based upon those lab results, stating "[t]o the extent Black contends the defendants should have placed him in the Hepatitis C Treatment Program, a mere disagreement between an inmate and the prison's medical staff as to the course of treatment does not establish deliberate indifference").

This point is probably well-taken. However, there is some indication that the standard of care was in flux during this time period and may have since changed. The BOP guidelines that Dr. Hagan relied upon and that were attached

### 3. Director Wilkens

As noted above, when Gordon grieved the fact that he was not being treated for hepatitis C, Wilkens invoked what appears to have been a DOCR policy (*i.e.*, not just an NDSP policy) requiring a six-month waiting period before any treatment would be afforded for hepatitis C and appears not to have scheduled Gordon to see a doctor at that point for that reason.

However, even if there was some constitutional infirmity in the DOCR's six-month wait policy and even if Wilkens could be held liable in her individual capacity for following it, Gordon has no viable claim here given that Gordon has failed to offer any evidence that he suffered any detriment as a result of his not getting hepatitis C treatment while at the NDSP. Also, there is no evidence that Wilkens was involved in the development of the six-month wait policy and, in terms of any personal liability, she could not be expected to second-guess the medical judgment of others with more training for the reasons articulated in Meloy v. Bachmeier, supra.

### E.    Low Back Pain and shoulder pain

### 1. Additional background

Gordon complained of back pain during his intake physical conducted by PA Houdek upon arrival at the NDSP. According to the doctor call notes:

> Michael is seen today for an admit physical. He is a federal inmate, transferred I believe from the Florida federal system. He states that overall he is in good health, with the exception of low back pain. He tells me he was scheduled to get a hydrocortisone injection

---

to his affidavit referenced the fact that new drugs for treatment of hepatitis C had recently come on the market and others were expected soon, suggesting that the guidelines might change going forward. (Doc. No. 69-1, p. 3). Also, because of new drugs having become available for treatment of hepatitis C and more recent research suggesting that blood monitoring may be insufficient in catching any ongoing liver damage, one district court in the Eighth Circuit has recently concluded that prisoners stated a claim under the Eighth Amendment with respect to the Missouri Department of Corrections relying upon blood monitoring to determine whether affirmative treatment was required for treatment of hepatitis C. Postawko v. Missouri Department of Corrections, No. 2:16-cv-04219, 2017 WL 1968317, at **1-9 (W.D. Mo. May 11, 2017), appeal pending, No.17-3029 (8th Cir. 2017). Also,

just prior to leaving his last federal system. He states he did have an MRI back in 2005 and was told that he has had herniated discs. He states he has pain down his his right leg that bothers him. It is not consistent, it is intermittent, and is usually exacerbated by sitting or walking long periods of time. He denies any bowel or bladder retention or incontinence. He denies any foot drop or weakness on the right side.
Physical exam has been done and recorded in EMRS. DTRs are 1+/4 knee jerk and ankle jerk bilaterally.
I am going to get x-rays of his back. We will see him back after the x-rays to review these results and possibly and [sic] set him up for an MRI after approval from the Federal Bureau of Prisons has been obtained.

(Doc. No. 68-1). Notably, there is no mention of Gordon having reported during his intake examination that he was taking gabapentin prior to being admitted to the NDSP, but he did request it the next day and was advised he would have to be seen by a doctor before it could be prescribed. (Doc. No. 68-1).[12]

Gordon was next seen for his lower pack pain by PA Houdek on July 7, 2014. The notes from that examination in relevant part are the following:

S: Michael is seen today for complaints of low back pain. He states that while he was in the Federal prison he was on 1800 mg of gabapentin twice a day for low back pain. He states that this occurred a long time ago when he was in the Federal system and was laying on his back pushing hard to try and bend some bars. He felt a popping at that time and since that time he's had off and on low back pain. He describes this as a burning pain down the right buttock. He states it's better if he gets up and moves around or shakes his leg. He does have pain that radiates down to his foot at times and causes his foot to be numb. He has no loss of strength, though the sensation does return. He has no bowel or bladder retention or incontinence. Standing can help. He had used gabapentin, but he is wondering if there is anything else. Sudden movements make it worse. He denies any pain with coughing, sneezing, or bearing down to bowel movement.

O: Physical exam - blood pressure 130/79, temp 98.7, pulse 68, respirations 14, weight is 239.4 pounds. In general, no acute distress, skin warm and dry.
Back - he has lost his lumbar curve. He is able to bend down and touch his toes but does complain of pain in this position. He is able to rotate and deviate to the right and to the left without complaints of pain. I am unable to really elicit any pain to palpation along the

---

[12] It is somewhat puzzling that the intake examination would not set forth what medications the prisoner was on prior to arriving at the NDSP and, if there were none, note that fact unless there were other nursing or chart notes associated with this examination that have not been made a part of the record. Further, it appears the medical professional conducting the intake physical did not have access to Gordon's most recent medical records from the facility where he was last at, much less that the NDSP ever acquired them as a condition to accepting Gordon as a prisoner.

lumbar or along the right and left paralumbar areas. No trigger points are palpated. Direct pressure right on the sciatic nerve does not reproduce any discomfort.

Musculoskeletal - there is no fasciculations or atrophy noted. He is able to flex and extend his great toe. He is able to dorsiflex and plantarflex without difficulty. He has strong and equal knee flexion and extension, strong and equal hip abduction and adduction, strong and equal hip flexion and extension. He is able to do a straight leg raise up to 70° and keep it in that position bilaterally without complaints of pain.

Neurologic - DTRs are 2+/4 knee jerk and ankle jerk. He has good sensation and is able to distinguish with 100% accuracy light and sharp touch.

A: Low back pain. Per his history, he states he was scheduled to have an epidural steroid injection due to the pain. His last MRI was in 2005.

P: *I have asked Jess Wilkens, RN to check with the Federal Bureau of Prisons for permission to go ahead and do another MRI.* We will see him back after that to discuss those results. He is requesting some sort of the anti-inflammatory. I will place him on Aleve 220 mg 1 po bid prn. He was instructed that he should take this after he has eaten a meal and to space this 10-12 hours apart. * * * *

(Doc. No. 68-7) (italics added). Defendants have offered no evidence, either documentary or by way of affidavit, that Director Wilkens sought approval from the FBOP for the MRI at that point, although later in November there is mention of seeking an expedited approval after Gordon filed a grievance.

Gordon was seen on October 7, 2014 by a staff nurse. The following are the notes from that encounter:

Inmate to sick call with c/o 8/10 R shoulder pain for past two weeks, see Shoulder protocol dated 10/7/14. Inmate reports pain with adduction, pain at front of R shoulder, feels that it is joint pain and not muscular pain; is unable to raise arm about chest level and unable to bring R arm/hand to L side of body comfortably. Inmate reports that he does lift weights, denies any recent trauma or injury to shoulder, advised to refrain from upper body weight training, orange card for application of ice to site QID 30″ x one week as has no analgesics at this time nor any ability to purchase via commissary; may renew if ice is beneficial, will kite prn. Referral entered to Dr Call, three tabs of 200mg IBU administered, no APAP as is hepatitis C reactive. LPN Kitzan,W

(Doc. No. 68-8). There are several things notable about this visit. One is that it is the first complaint of shoulder pain. Second, there is no mention of back pain, and one would think that, if Gordon's lower back pain was so bad, it would have been mentioned. Third, Gordon's back pain

apparently had not prevented him from lifting weights.

Gordon sent a note on October 12, 2014, again complaining about shoulder pain, which was responded to the next day advising Gordon the he had been placed on doctor call.  (Doc. No. 68-10).

On November 1, 2014, Gordon filed grievances in which he complained about the fact that treatment for his back pain and shoulder pain had not been forthcoming.  Gordon claimed he had been on 1800 mg of gabapentin, twice daily, at the federal penitentiary where he was being housed prior to being transferred to the NDSP and that he had also been scheduled for an epidural shot. Gordon stated he had requested medical attention for his low back pain months ago and was under the belief that an MRI would be obtained but nothing had happened.  He further stated that the Aleve that had been prescribed earlier was not working and was upsetting his stomach.  (Doc. No. 67-14, p. 120).[13]

> In an informal response dated November 7, 2014, defendant Director Wilkens stated:
>
> Inmate Gordon has doctor call scheduled for shoulder & back pain.  Appt moved up on doctor call schedule . . .   [illegible].  MRI requests will be expedited to Federal CM. Inmate.  Inmate . . . . [illegible] pickup n600 mg Ibu & . . . . [illegible] for pain control until Dr. call Appt.  Will follow up with inmate next week to discuss how things are going.

(Doc. No. 67-14, p. 120).

Gordon was seen by Dr. Hagan on November 10, 2014, for both his complaints of low back and shoulder pain.  Dr. Hagan's notes from that visit are the following:

> CHIEF COMPLAINT: Evaluate right shoulder pain; re-evaluate low back pain.
>
> SUBJECTIVE: This patient presents with two separate complaints. His first complaint is intermittent low back pain. He reports that he often has an ache that is low and his back. He has used anti inflammatories for this. He also reports episodes of pain radiating from his back down his right leg. When asked about this he points to his SI joint on the right and

---

[13]  Apparently, these grievances were identical to ones he had filed a week or so earlier and had refiled them because no action had been forthcoming.  (Doc. No. 68-11).

indicates with his hand that the pain comes from this spot and radiates to the lateral and anterior aspect of his leg. He reports that on occasion when the pain travels below his knee that it continues on the lateral side of his calf and travels to the lateral side of his foot over the lateral malleolus. On questioning, he reports that during some months he has no pain, but during other months he may have episodes of pain like this on 20 days out of the month. He reports when he is standing on his leg and this pain occurs, if he moves and shifts the weight off of it and shakes his leg that the pain will go away in about 5 minutes. He describes the pain as sharp and shooting. On questioning, he denies any bowel or bladder dysfunction. He reports no weakness or give away of the knee. He reports no fasciculations. He reports no injury to his back or leg. He reports that he had an MRI of his back performed in 2005 that showed three bulging disks and one herniated disc on the right. He reports that he was going to get a steroid injection in his back just before he was transferred from the federal system to this system. In regard to his shoulder, he reports that his pain began three or four weeks ago. On questioning, he reports no preceding activity or injury. He states that he has particular pain when he tries to raise his right arm above 90° in anterior elevation with the humerus internally rotated and the elbow flexed to 90° so that the patient's forearm is directly parallel to the ground and his fist is in line with his midline.

OBJECTIVE:

Blood pressure is 105/71.

This patient is a well developed male in no acute distress. The patient is able to remove his t-shirt by raising both arms high in the air and flexing elbows maximally in order to grab his t-shirt collar behind his neck with both hands and pull his shirt off over his head. Upon donning his shirt at the end of the examination, he is able to reach behind himself with both hands and tuck his shirt tail in.

Shoulder examination: Examination from behind shows normal musculature of the suprapinatus and infraspinatus bilaterally. Patient notes some tenderness when palpating along the lower edge of the teres minor on the right. He has no pain on palpation over the coracoid processes and no pain on palpation over the subscapularis bursa or over the insertion of the subscapularis tendons bilaterally. He has no pain on palpation in the biceps groove bilaterally. Examination from the front shows normal biceps size with no evidence of biceps tear. Biceps and triceps strength is normal bilaterally. The patient shows full range of motion in anterior elevation. He shows full strength in resisted anterior elevation although he describes some mild discomfort in the right shoulder with this maneuver. He is able to adduct both arms to 90° laterally. I then asked him to bring both arms forward about 10-20°. When asked to rotate internally he complains of great pain in his right arm and says he cannot perform this maneuver. When I take the weight of his right arm and provide gentle traction laterally in abduction, he complains that he still cannot perform this maneuver due to extreme pain. He is able to bring his arms down to side without difficulty when not in full internal rotation, which he says he cannot perform due to pain. He again shows me about limitations in range he feels with cross-chest adduction of his right arm followed by anterior elevation.

Back exam: this patient's gait is non-antalgic. He is able to arise from a chair with no arms on it stand and walk down the hall to the examination room, cross to the examining table, use the step up onto the table, turn around 180 degrees and sit. He is able to lay flat and recover without assistance or evidence of discomfort. Examination of his quadriceps, biceps femoris, gastrocnemus shows no evidence of atrophy. Pulses are 2 + at the patella and

posterior tibial bilaterally. Strength is five out of five in the ileopsoas, quadriceps, gastrocnemius and extensor hallicis longus bilaterally. Reflexes are normal at patella and the Achilles bilaterally. Sensation is grossly intact throughout. The patient does not describe pain with straight leg raise to greater that 60 degrees with ankle in dorsiflexion on right or left. He does describe mild pain with resisted straight leg raise on the right at about 30 degrees.

ASSESSMENT/PLAN:

1.    Right shoulder discomfort: this presentation is markedly abnormal for supraspinatus tendinitis. There is no evidence of subscapular tendinitis. *I am aware that the patient was in an altercation about a month ago. He does not report injury from that altercation. He does report that this discomfort interferes with performing extended activities of daily living. He states that he is not lifting weights at this time. His report contradicts the report of the athletic director for this facility, who reports to me by telephone that he has observed this patient lifting weights numerous times, and that the patient was adamant about having his gymnasium and weight room restriction removed after his altercation so he could resume his activities. Patient reports he cannot play basketball due to his pain. This is also contradicted by the report of the athletic director.* At his time, the patient agrees to accept a restriction from all weight lifting and court or team sports while undergoing evaluation and treatment by physical therapy. PT will determine when to release his restrictions.

2.    Mechanical low back pain: This patient reports mechanical low back pain. His report of occasional radiating pain does not correspond appropriately to any peripheral nerve distribution or dermatome. In absence of evidence of myelopathy or radicular pain, I will recommend continued anti inflammatories and activity modification. There is currently no indication for advanced imaging such as MRI. The patient does agree to a change of anti inflammatories to etodolac 400 mg twice daily with food as needed  He is advised of increased risk of hypertension, heart attack, stroke and bleed with the use of any anti inflammatories.

(Doc. No. 68-13, pp. 1-3) (italics added).  There are several things of particular note with respect to this examination.  The first is Dr. Hagan's observation that Gordon was not in acute distress.  The second is that the reports of his gym activity were in contradiction to the claimed severity of back and shoulder complaints.  Finally, Dr. Hagan's observations about the ease with which Gordon was able to remove and put back on his tee shirt with no observable distress was likewise contrary to the claimed severity of his shoulder condition.

Gordon next filed a Step 2 grievance on November 26, 2014, claiming he was still suffering

"severe pain" and demanding that he be put on 1800 mg gabapentin twice daily, which he claimed

he was on in the federal system, and that he be given a hydrocortisone shot, which he claimed he was

due to have received in the federal system just prior to being transferred. (Doc. No. 67-14, p. 119).

Apparently, notwithstanding Dr. Hagan's conclusion during the November 10, 2014

examination that there was not a current need for an MRI, Director Wilkens arranged for one anyway

and that was completed in early December. (Id. at p. 119). Gordon was seen by PA Houdek on

December 10, 2014 for review of the MRI, but according to the notes of that examination:

> He was here for review of his MRI, however the MRI cannot be located. We'll see him back
> in 2-3 weeks to review his labs and also review this with him.

(Doc. No. 68-16).

Dr. Hagan saw Gordon again two weeks later and the following are his notes of that

examination:

> DATE: 12/26/2014
>
> CHIEF COMPLAINT: Follow up mech low back pain
>
> SUBJECTIVE: This patient had seen a colleague in this clinic and underwent an MRI of the
> LS spine. It reveals mild bulging at L4-L5 with no compression or impingement, and
> posterior central disc protrusion at L5-S1 of 3mm causing mild compression of the anterior
> thecal sac and making contact with, but not compressing, the S1 nerve route on the right.
> The patient reports ongoing back pain. Again, on questioning, he does not relate any pain
> traveling below the knee. He also reports increasing shoulder pain bilaterally in anterior
> elevation above 90 degrees. He is concerned about popping sounds he hears with these
> motions. Of note he reports absolutely no exercise or sports participation since our last
> meeting. He tried etodoloac for one week, then stopped is due to its being ineffective.
>
> OBJECTIVE:
> BP 115/66
> ROM of shoulders is normal as he demonstrates to me the movements that cause popping.
> Gait is not antalgic. Pace and stride are normal.
>
> ASSESSMENT/PLAN:
> 1. Ongoing complaints of low back pain with MRI showing degenerative disk disease.
> a.    *Add gabapentin 300 mg po BID*
> b.    *Patient is counseled to restart etodolac.*

-33-

    c.     *PT referral to evaluate and treat low back pain and bilateral shoulder pain*

    d.     I will contact athletic department to seek further information regarding extent and frequency of sports and exercise activity. The patient's report of activity conflicted with the Athletic Director's report of activity at our last office visit. This information will likely be helpful to the physical therapist who evaluates him.

    e.     Mild elevation of TSH: unlikely to be of clinical importance (although pt notes constipation and is undergoing colonscopy for fam Hx of colon Ca). I will recheck this in 4 weeks and review the result with him at our next visit.

    f.     Return to clinic in 8 weeks to evaluate the effectiveness of this plan.

(Doc. No. 68-18) (emphasis added).

While Gordon was prescribed gabapentin on December 26, 2014, it is not clear from the record when he actually received it. In fact, a fair inference from the record here is that he did not receive it until after he again saw a nurse practitioner on February 24, 2015, some two months later. Notably, Gordon filed a grievance on December 31, 2014, complaining about the fact the gabapentin had not yet been provided. (Doc. No. 67-14, p. 107). In the informal response to that grievance, Director Wilkens responded on January 2, 2015, stating that FBOP approval was required before he could be started on the medications and that, while the order had been faxed to the FBOP for its approval, the pharmacy had not received a response as of that date. (Id. at p. 108). Gordon then filed a Step 2 grievance on January 2, 2015, and, based on the response by Jean Sullivan on January 9, 2015, it appears the gabapentin had still not been made available. (Id. at p. 106). Gordon next filed an appeal to the Director of the DOCR on January 20, 2015, and the tenor of that appeal was that Gordon was still not receiving the gabapentin. Then, to close the loop on the grievance, the DOCR Director in a March 3, 2015 letter to Gordon recited the history of Gordon's grievances and then stated:

> Your grievances and appeal were reviewed. Pharmacy staff at NDSP were contacted on this matter. Pharmacy has dispensed the medication. I considered [sic] this matter resolved.

(Id. at 67-14). Notably, the Director did not state when the pharmacy had been contacted, by whom,

or when the medication was first dispensed.  Further, as discussed in a moment, when a nurse practitioner saw Gordon on February 24, 2015 (a week prior to the Director's letter), the notes of the examination state that the only medication that Gordon was receiving at that point was Lodine (etodolac) and that the nursing practitioner was "added" 400 mg. twice daily of gabapentin.  Further, this was consistent with the nursing notes for an examination of Gordon's continued complaints of shoulder pain two weeks earlier on February 10, 2015, which noted that the only medication that Gordon was on was etodolac.  (Doc. No. 68-21).[14]

Returning to the chronology of the medical treatment, Gordon was seen by a physical therapist on January 8, 2015 for both his shoulder and low back pain complaints. Some work was done and Gordon was given exercises to do.  (Doc. No. 68-19).  Notably absent from this report are complaints of pain so severe that Gordon could not participate in the therapy or would not be able to do the prescribed exercises.

Gordon was next seen on sick call by nursing staff for several complaints.  The following was noted with respect to his complaints of back and shoulder pain:

> Inmate with four kites to sick call regarding bilateral shoulder pain, back pain, eye pain and varicose veins. See Shoulder and Eye protocols dated 2/10/15 regarding these issues. Inmate reports that since starting prescribed PT for shoulder pain that pain is increasing, R > L, reports 9/10 pain with extension/ROM, no deformity noted. Referral entered for f/u regarding shoulder pain. * * * * Inmate reassured that he does have a pending f/u Dr Call regarding back pain and varicose veins * * * *.

(Doc. No. 68-20).

Gordon did see nurse practitioner Jenna Herman on February 24, 2015.  The following are

---

[14]   While the need for FBOP approval for significant procedures is understandable, what is difficult to understand is the necessity for approval of commonly administered non-narcotic prescription pain relievers if the NDSP is to be the front-line medical care provider.  And, if the concern is that the FBOP would not pay for it, then it appears the NDSP has a readily available remedy:  tell the FBOP to pick up its prisoner.  Likewise, the same is true if the FBOP is not timely responding to requests for medical approvals.

the notes from that examination:

> Chief Complaint: Follow-up on low back pain and repeat TSH.
>
> Subjective: Michael comes in for follow-up of low back pain that has been going on since 2005. He is taking Lodine, which he states is not helping. He would like to try gabapentin. His repeat TSH is normal. It was slightly increased in December. He recently underwent an MRI in December, which showed a posterior central disc protrusion at L5-S1, 3 mm causing mild compression of the anterior thecal sac and making contact with but not compressing the S1 nerve root on the back. The patient reports ongoing low back pain. He states the pain does not go below the knee. He also has increasing shoulder pain bilaterally while raising his arms above the shoulders.
>
> Objective: Vitals - blood pressure 109/75. Gait is not antalgic.
> He has full range of motion in the back.
> Negative straight leg raise.
> Range of motion at the shoulders is normal.
>
> Assessment:
>     1. Low back pain.
>     2. Shoulder pain.
>
> Plan:
>     1.    *Added gabapentin 400 mg po bid. He was also referred to physical therapy to treat low back pain and bilateral shoulder pain. He will also continue the Etodolac.*
>     2.    Elevated TSH: This level is now normal so no further testing is required.

(Doc. No. 68-22) (emphasis added)..

Gordon subsequently requested an increased dosage of gabapentin and was advised by nursing staff on March 7, 2015 that he could discuss this with the doctor during his already scheduled next appointment.  (Doc. No. 68-23).

As already noted, Gordon saw Dr. Hagan on March 24, 2015, which was three days before he was removed from the NDSP.  During that visit, Dr. Hagan addressed Gordon's continued complaints of back and shoulder pain, noting the following as related to these issues:

> Chief Complaint: Bilateral shoulder pain and dry eyes; add-on hepatitis C treatment, back pain.
> Subjective: Michael is seen in AS clinic. He is initially seen for shoulder pain and issues with dry eyes. At his request, I am adding on hepatitis C treatment and back

pain.

The patient reports that his shoulder pain is worsening and that he has difficulty getting full range of motion with his shoulders. He has seen physical therapy. He reports he had to stop doing the exercises because even the least amount of exercise was causing him too much pain.  * * * * In regard to back pain, the patient feels that his gabapentin and anti-inflammatories have been inadequate.

Objective: Blood pressure is 111/65.
HEENT exam shows normal sclera with no conjunctival injection.
Lower extremity strength and reflexes are intact. The patient's gait is non-antalgic.

Assessment and Plan:
1.    Bilateral shoulder discomfort: The initial plan from Physical Therapy was treatment. The patient is to return if his symptoms are not improved. We will continue to follow this plan. The patient agrees to return and visit with Physical Therapy further.

* * * *

3.    Persistent back pain: The patient appears to be mobile without difficulty. He has no objective signs of myelopathy. Our working plan has been for stepped therapy. At this time I will increase his gabapentin to 800 mg twice daily. The patient will be reevaluated in 4 weeks. If the patient has no improvement or inadequate response at 1800 mg per day, I will request an evaluation and consultation with Pain Management for consideration for epidural steroid injection. The patient agrees with this plan.

(Doc. No. 68-24).

        2.    *Dr. Hagan*

Gordon claims Dr. Hagan was deliberately indifferent in how he addressed Gordon's low back and shoulder pain.  However, it is clear that Dr. Hagan did not give short shrift to his complaints.  Rather, he conducted detailed physical examinations and reviewed diagnostic imaging.  Then, with respect to both conditions, he concluded that the appropriate approach was a progressive escalation of treatment based upon Gordon's reaction to it, including the prescription of anti-inflammatories of different types, referrals for PT, prescription of additional and different pain relievers of increasing dosages, and, finally, a referral to Pain Management for a possible epidural

steroid injection.  Given what is before the court, no reasonable jury could conclude that Dr. Hagan was criminally reckless or, for that matter, even negligent.  This is particularly true against the backdrop of there being no credible evidence that Gordon was ever in acute distress and the overwhelming evidence that Dr. Hagan could justifiably be cautious in taking as the "gospel truth" all of what Gordon was reporting to him.  Further, this is assuming that Gordon was at all times in disagreement with the course of treatment, which is not at all clear based on Dr. Hagan's notes.[15]

### 3.   Director Wilkens

Gordon claims that Director Wilkens was deliberately indifferent in not seeing to it that he received the care and treatment he was prescribed with respect to his back and shoulder conditions.  And, while Wilkens cannot be expected to second-guess the treatment prescribed by the primary care providers with more expertise, she does appear to have been responsible for seeing to it that the prescribed care was carried out.  And here, at least based on the current record, it appears Gordon went a substantial period of time without being given the gabapentin that Dr. Hagan prescribed on December 26, 2014 - possibly more than two months.  Further, even if lack of diligence on the part of the FBOP might account for part of the delay, it is doubtful that this would be a justifiable excuse if Gordon was in acute distress given the responsibilities undertaken by the NDSP by housing him.

That being said, the medication that Dr. Hagen prescribed on December 26 was additional pain medication; Gordon was already on the pain relieving anti-inflammatory etodolac.  Further, even if it was Wilkens who personally was less than diligent in addressing this matter (which has not been clearly established), no reasonable jury could conclude it rose to the level of criminal

---

[15]  Based on the division of responsibilities in the medical department, it does not appear that Dr. Hagan was responsible for what appears to have been an administrative snafu in terms of Gordon actually receiving the gabapentin that Dr. Hagan first prescribed on December 26, 2014.

recklessness.  This is particularly true given that Wilkens did make efforts to address Gordon's complaints of back and shoulder pain, including in one instance seeing that Gordon obtained a stronger anti-inflammatory until he could next see the doctor and arranging for an MRI even though Dr. Hagan was not convinced one was necessary.

## IV.   RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** that defendants's collective Motion for Summary Judgment (Doc. No. 64) be **GRANTED** to the following extent:

1.    The Eighth Amendment claims defendants Hagan and Wilkens be **DISMISSED WITH PREJUDICE**.

2.    The retaliation claims against defendants Heit and Foster be **DISMISSED WITH PREJUDICE**.

3.    The retaliation claims against defendants Flanagan, Stromme, Wald, Thuerer, Kulman, Belisle, Schwehr, and Helgeson be **DISMISSED WITHOUT PREJUDICE** for failure to exhaust available prison remedies.

### NOTICE OF RIGHT TO FILE OBJECTIONS

Pursuant to D.N.D. Civil L.R. 72.1(D)(3), any party may object to this recommendation within fourteen (14) days after being served with a copy of this Report and Recommendation. However, given that plaintiff is in custody and is proceeding pro se, he shall have thirty (30) days from service to file any objections.  Failure to file appropriate objections may result in the recommended action being taken without further notice or opportunity to respond.

Dated this 3rd of January, 2018.

/s/  Charles S. Miller, Jr.
Charles S. Miller, Jr., Magistrate Judge
United States District Court